UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 1:20CR129 |
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| COREY AGEE | ) | |
| | ) | |

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and files this Factual Basis in support of the Plea Agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2, and it does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to the Plea Agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime. The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States may submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The Defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

### Introductory Paragraphs

1. Beginning at least as early as 2013, and continuing through at least December 2019, in the Western District of North Carolina and elsewhere, the defendant, COREY AGEE, and others known and unknown to the United States Attorney, knowingly participated in a scheme to defraud the IRS by marketing,

implementing, and defending tax shelters in the form of fraudulent syndicated conservation easements ("SCEs"), and by using means and methods intended to deceive the IRS about the legitimacy of those transactions and about the circumstances under which the fraudulent tax shelters were marketed and implemented.

2. Defendant COREY AGEE ("AGEE") and his co-conspirators marketed, and implemented the fraudulent SCEs for wealthy clients through false and fraudulent means, including preparing and causing to be prepared, and filing and causing to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent SCE tax shelter losses, resulting in the payment of far lower taxes by the clients. AGEE marketed, implemented, and sold these fraudulent SCE's, in part, to enrich himself personally through the generation of fee and commission income. AGEE and his co-conspirators also utilized the SCE tax shelters to evade their own taxes on the substantial income received, at least in part, through the sale of the fraudulent SCE tax shelters.

## The Defendant and Associated Individuals and Entities

3. From in or around 2005 through the present, AGEE worked as an accountant at an Atlanta-based accounting firm ("Accounting Firm 1"). In or around 2007, AGEE became a partner at Accounting Firm 1 and in 2013, AGEE earned his certified public accountant ("CPA") license. AGEE managed and supervised the audit department of the firm. In addition, AGEE also maintained his own set of clients within the firm with whom he worked directly to provide accounting and tax planning services.

4. Promoter A, a co-conspirator known to the United States, was a partner at Accounting Firm 1 until in or around 2002, when he left the firm to start Company 1. Through Company 1, Promoter A, together with others, including AGEE, marketed "real estate investment funds" which were, in reality, tax shelters in the form of fraudulent syndicated conservation easements (the "SCE Funds" or "Funds").

5. AGEE, Stein Agee, AGEE's brother, and one other partner from Accounting Firm 1 used LLC-1 to, among other things, hold various income generating assets in which the three partners made investments.

6. Since at least 2008, Promoter A and Company 1—sometimes directly, and sometimes through various corporate intermediaries—have occupied the role of

2

"manager" for the SCE Funds. In total, Promoter A, through Company 1, has organized, promoted, and sold at least 23 SCE Funds.

7. Attorneys A and B, co-conspirators known to the United States, worked for Promoter A and Company 1 since at least 2012. Attorneys A and B assisted Promoter A with the creation, marketing, and implementation of the fraudulent syndicated conservation easement tax shelters.

8. Attorney D, a co-conspirator known to the United States, assisted Promoter A and other co-conspirators with drafting promotional material for the SCE Funds and promoted the SCE Funds to his own clients, as well as organizing and selling his own syndicated conservation easement funds to his clients.

9. Land Conservancy 1 is a purported non-profit 501(c)(3) organization, founded in North Carolina, that claims to be "dedicated to protecting natural resources through conservation easements."

10. Land Conservancy 2 is a purported non-profit 501(c)(3) organization founded in Pennsylvania that claims its primary purpose is "preserving and managing open space with ecological, agricultural or historical significance."

11. Individuals A and B are real estate owners who participated in real estate and conservation easement donation transactions with Promoter A and Company 1.

12. Appraiser 1, a co-conspirator known to the United States, is a licensed appraiser based in North Carolina who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2008.

13. Appraiser 2, a co-conspirator known to the United States, is a licensed appraiser based in Atlanta, Georgia, who performed conservation easement appraisal work for Promoter A and Company 1 since at least 2015.

## The Internal Revenue Service and Its Forms

14. The Internal Revenue Service ("IRS") was and is an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States.

3

15.     An IRS Form 1065, U.S. Return of Partnership Income, was and is an information return filed by partnerships to report their income, gains, losses, deductions, credits, etc. A partnership does not pay tax on its income but "passes through" any profits or losses to its partners. Partners must include partnership items on their tax and information returns.

16.     A Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., was and is a schedule of the IRS Form 1065 that members of a business partnership use to report their share of a partnership's profits, losses, deductions, and credits to the IRS. The partnership is also required to furnish Schedules K-1 to its partners reporting each partner's distributive share of partnership income or loss, and separately stated items, among other things.

17.     An IRS Form 8886, Reportable Transaction Disclosure Statement, was and is an IRS form filed by a taxpayer, including an individual, trust, estate, partnership, S corporation, or other corporations, to disclose information about reportable transactions in which the taxpayer participated. Reportable transactions include "listed transactions." A "listed transaction" is a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction. These transactions are identified to the public by notice, regulation, or other form of published guidance as a listed transaction. Under Notice 2017-10, the IRS identified certain syndicated conservation easement transactions as "listed transactions."

18.     A Form 8283, Noncash Charitable Contributions, was and is a form taxpayers attached to their individual income tax returns to report information to the IRS about non-cash charitable donations. Conservation easement donations are reported on Forms 8283. Taxpayers claiming a deduction of more than $500,000 for a donated item were required to attach a signed copy of a qualified appraisal of the property to the taxpayer's return. The appraisal must be signed and dated by a qualified appraiser in accordance with generally accepted appraisal standards. The appraiser is required to sign the Form 8283. The donee organization that receives the donated property must also sign the Form 8283 acknowledging the donation. The form is attached to a tax return signed under penalties of perjury and submitted to the IRS.

4

## Law Related to Syndicated Conservation Easements

*Charitable Deductions, Qualified Conservation Contributions, and Conservation Easements*

19.     Pursuant to the Internal Revenue Code (the "Code"), and subject to certain limitations set forth therein and in the associated regulations, a taxpayer may take a deduction for any "charitable contribution" made within the taxable year. The amount of the deduction generally equals the fair market value of the contributed property (here, the value of the conservation easement) on the date of the charitable contribution, except as otherwise specified in the Code.

20.     In addition to requiring that payment for a charitable contribution be made during the taxable year for which the associated deduction is claimed in order for the deduction to be valid, the Code generally requires taxpayers to compute their taxable income on the basis of their taxable year. This is commonly known as the "annual accounting period." This annual accounting method does not permit consideration of events happening after the close of the taxable year, nor does it permit the subsequent reopening of a prior year for adjustment of deductions.

21.     Generally, a taxpayer may not claim a charitable contribution deduction for a contribution of a partial interest in property. However, the Code and associated regulations make an exception for a "qualified conservation contribution." A qualified conservation contribution is a contribution of a qualified real property interest, to a qualified organization (such as a qualified 501(c)(3) organization), exclusively for conservation purposes. A contribution is not a qualified conservation contribution unless the conservation purpose of the contribution is protected in perpetuity and certain other requirements are satisfied.

22.     "Conservation purposes" include: (1) the preservation of land areas for outdoor recreation by, or for the education of, the general public; (2) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem; (3) the preservation of open space (including farmland and forest land) where such preservation is for the scenic enjoyment of the general public, or pursuant to a clearly delineated Federal, State, or local governmental conservation policy and will yield a significant public benefit; and (4) the preservation of an historically important land area or a certified historic structure.

5

23.     A properly structured "conservation easement" is one type of "qualified real property interest," under the Code and associated regulations, the donation of which by a taxpayer can form the basis for a charitable contribution deduction. A conservation easement is a legal agreement through which a landowner and another party, typically a non-profit, agree to permanently restrict the development and/or use of the land with the purpose of achieving certain conservation or preservation goals. For example, a taxpayer might donate an easement to a land trust restricting any development of a large tract of woodland property that would be inconsistent with the preservation of that property as an intact habitat for certain wildlife species.

24.     Subject to certain exceptions, when an individual taxpayer donates a conservation easement as a charitable contribution in a manner consistent with the Code and associated regulations, that taxpayer may use the deduction associated with the donation of the easement to offset up to 50 percent of his or her taxable income for the relevant taxable year, and may carry forward any excess for up to 15 years. The total amount the taxpayer may deduct depends on the fair market value of the contribution—that is, on the fair market value of the conservation easement.

*Pass-Through Entities, Partnerships, and Economic Substance*

25.     An entity taxed as a partnership is referred to as a "pass through" or "flow through" entity because it is not itself liable for income tax. Instead, its partners, or members, are proportionally liable, in their separate or individual capacities, based on the income, losses, deductions, or credits "passed through" the entity.

26.     Each partner takes into account his or her share of the partnership's income or loss and any "separately stated items" in computing his or her income tax liability. "Separately stated items" are specific items of income, gain, loss, deductions, and/or credits that a partner must account for separately. A charitable contribution, such as a conservation easement donation, constitutes a "separately stated item."

27.     For tax purposes, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is operated, and which is not a corporation or a trust or estate. A limited liability company ("LLC") with two or more members is treated as a partnership for federal income tax purposes unless it affirmatively elects to be treated as a corporation.

6

28.     If a partnership is organized with no business purpose other than tax avoidance, then the partnership lacks economic substance and/or is a sham under federal tax law.  According to the Code, the "economic substance doctrine" means that a transaction shall be treated as having economic substance only if (A) the transaction changes in a meaningful way (apart from federal income tax effects) the taxpayer's economic position, <u>and</u> (B) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into such transaction.

## The Syndicated Conversation Easement Tax Fraud Scheme

*General Overview of Fraud in the Design, Marketing, and Implementation of the SCE Funds*

29.     From at least in or about 2013 through 2018, the design, organization, promotion and sale of the SCE Funds were carried out in a similar manner.  The SCE Funds promoted, and sold by Promoter A, AGEE, and other co-conspirators were designed to produce bogus tax deductions for high-income taxpayers through partnership entities that lacked both economic substance and business purpose.  The transactions existed merely to provide tax deductions to their so-called investors.

30.     Although facially described in promotional material as real estate investment funds, the SCE Funds were, in reality, illegal tax shelters that allowed taxpayers to buy tax deductions at the end of any given tax year—as well as after the end of a given tax year—to shelter their income from the IRS, with no economic risk.

31.     Promoter A, as well as other co-conspirators, were well aware of the need to make the SCE Funds appear to have economic substance so that the IRS would accept the bogus deductions.   In reality, according to AGEE, his clients who participated in the SCE Funds were interested in the tax deductions in order to reduce their tax liability.

32.     The same was true throughout Promoter A's enterprise.  To generate the appearance of compliance and to deceive the IRS, Promoter A and his co-conspirators generated marketing materials, including a private placement memorandum ("PPM"), for each of the SCE funds and provided them to potential investors and/or the financial advisors, accountants, or attorneys who served as sub-promoters for Promoter A.  On the surface, these marketing materials advised the investors that the investment returns could come in the form of any of "income production, capital appreciation and/or tax benefits," and that the Fund only <u>might</u> "achieve its objectives" by making tax-

7

deductible donations of its property (or portions thereof) to a charitable organization. Furthermore, on the surface, the PPMs claimed that investors could choose from one of three options for the fund: (1) the development of the real property (the "Development Option"); (2) the holding of the real property for appreciation (the "Buy and Hold Option"), or (3) the placement of a substantial portion of the real property into a conservation easement for tax benefits (the "Green Investment Option").

33.    In a similar vein, on the surface level, the PPMs typically advised investors that, following the acquisition of the real property in question, Company 1, as the "manager" of the fund, would make a "recommendation" to the investors about which one of the three options to pursue, and the investors would then formally vote on whether or not to approve the selected option. According to one PPM, "if" the Green Investment Option were chosen through this process, the investors could offset up to 50% of their adjusted gross income as a result of the donated conservation easement.

34.    As noted above, these materials were knowingly drafted to create an illusion of legitimacy. Promoter A enlisted professionals, including Attorney D, to assist with drafting the promotional materials to ensure that the SCE Funds appeared legitimate.

35.    In reality, and just as the co-conspirators intended, for every single one of the SCE Funds promoted and offered by Promoter A, AGEE, and the other co-conspirators for the 2013 through 2018 tax years, the purported investor/taxpayer "vote" resulted in the selection of the "Green Investment Option"—meaning the tax benefits option. These "votes" were not true votes by the investors, and the outcome was in fact predetermined. In other words, the placement of a conservation easement over the real estate for any given SCE Fund was always a foregone conclusion.

36.    According to AGEE, his clients were frequently confused about the purpose of the vote. When asked, AGEE instructed his clients to "vote" for the "Green Investment Option," because that was the option that provided the tax savings. AGEE understood that regardless of the purported "vote" each year, the outcome would always be the placement of a conservation easement over the real property.

37.    In other efforts to make the SCE Funds appear to have economic substance beyond the purchase of tax benefits, despite knowing that they did not, the promotional materials also indicated that the "residual property"—the property

8

remaining after the donation of the conservation easement—would eventually be developed or sold.

38.     Several of Promoter A's sub-promoters were, like AGEE, in the accounting and/or tax preparation business, and, on Promoter A's instructions, they marketed Promoter A's SCE Funds to wealthy clients anticipating large tax bills by promising that an "investment" in the SCE Funds would return a tax savings ratio of at least 4:1—often between 4.2:1 and 4.5:1. In other words, for every dollar the client paid to Promoter A to become an "investor" in a SCE Fund, the client-taxpayer would be purchasing more than four dollars' worth of tax deductions. Many of the marketing materials Promoter A used to advertise SCE Funds to clients listed examples of the tax value of an individual investor's charitable contribution deduction based upon a hypothetical amount of cash invested. These marketing materials also assured investors that, even in the event of an "IRS Examination" resulting in an adjustment, the investors' tax savings would still be significant.

39.     Promoter A set these "ratios" for the SCE Funds by balancing the need to make the tax shelter purchase desirable for prospective investors against the need to avoid and protect against IRS scrutiny. For each of the SCE Funds, Promoter A typically set aside significant funds in reserve for legal defense.

40.     Promoter A, Attorney A, and other co-conspirators would determine and distribute a preliminary "ratio" for any given SCE Fund to AGEE and the other sub-promoters around the time the SCE Fund was announced, but before its release, so that the sub-promoters could begin marketing the tax shelter to high net-worth individuals using that tax savings ratio. Indeed, for every SCE Fund that AGEE sold, the final ratio for tax savings always nearly matched the preliminary ratio which almost always ended up being between 4:1 and 4.4:1.

41.     That was because Promoter A was pre-determining the value of the easement before any appraisal was performed, in order to be able to market the desired tax savings ratio to prospective "investors" early on. Indeed, many of Promoter A's marketing materials informed "investors" of the value of the "CE Deduction" (meaning the value of the easement) long before the final appraisal had been performed. Promoter A, AGEE, and some of their co-conspirators regularly provided the tax savings ratio to prospective investors before Appraiser 1 or Appraiser 2 had performed or written a final appraisal on the value of the easement. AGEE typically used 4.4:1 ratio when projecting his clients' tax deductions, because it was predictable.

9

42.     Furthermore, for at least six SCE Funds organized and sold between 2013 and 2018, Promoter A, AGEE, and other sub-promoters marketed and sold units to investor-taxpayers <u>after</u> the tax year had concluded.   On several occasions, Promoter A approached AGEE at year-end and informed AGEE that he needed to raise more capital for some of these Funds.  Promoter A asked AGEE to help find additional "investors" to raise the capital.  In response, for several of these Funds, AGEE approached clients who had already invested before the year end but, based on their income, looked as if they could use additional tax deductions.  He asked these clients to invest a second time for the same year.  AGEE also found additional "investors" to "invest" after the close of the year.

43.     These investor-taxpayers were not members of the pass-through entity at the time the charitable contribution was made by the pass-through entity, nor were they members at the time the tax year in which the charitable contribution was made came to a close, and they therefore could not claim a lawful deduction for the SCE Fund's charitable contribution.

44.     Nonetheless, these late "investors" did improperly claim deductions related to their SCE donations, often aided in doing so by the co-conspirators assisting them with the backdating of subscription agreements and checks to make the "investments" appear more legitimate.  Late investors backdated documents, including payments, subscription agreements and other related documents.  Promoter A, AGEE and other co-conspirators used several different methods to facilitate and disguise the late sales.  For example:

   a. In at least one instance, Promoter A and other co-conspirators created, or caused to be created, two "shell" entities that were used to hold and sell units in a SCE Fund after the close of the tax year.

   b. In other instances, Promoter A, AGEE, and other co-conspirators, backdated, and caused to be backdated, subscription agreements, checks, and other documents related to the transactions.

   c. In yet another instance, Promoter A, AGEE, and other co-conspirators used purported "promissory notes" to attempt to cover up the late transactions.

10

45. After the instance described in Paragraph 44(a) above, which was in 2013 and 2014, Promoter A and other co-conspirators determined that they did not need to create separate registered entities to hold and sell unsold units in their SCE Funds after the close of the relevant tax year. Instead, the unsold units were allocated to a placeholder "investor," in their internal books, named "LTS." "LTS" was an acronym for "Left To Sell," and the "LTS" entry on the enterprise's books represented units of tax shelter that the co-conspirators still had left to sell to "investors" after the close of the relevant tax year. Later, after the units allocated to LTS were sold, additional Schedules K-1 would be issued to the late-joining investors, without requiring any modification to the Schedules K-1 already issued.

46. As noted above, in many instances of late "investments," Promoter A, AGEE, and other co-conspirator/sub-promoters instructed investor-taxpayers to backdate transaction documents and backdate checks to make it appear to the IRS as if the late "investments" were made during the correct tax year. Furthermore, in order to deceive the IRS in the event of any future examination, Promoter A, AGEE, and other co-conspirators specifically required late investors-taxpayers to make their payments by backdated checks instead of wiring the payments to the SCE Funds' accounts. That was because, in the event of government scrutiny, the co-conspirators knew that the government would easily be able to determine the dates of wire payments through the collection of bank records from third parties.

47. After securing "investments" by marketing the SCE Funds to wealthy individuals in the manner described above, both before and after the relevant tax year closed, Promoter A, AGEE, and other co-conspirators thereafter caused false and fraudulent tax returns to be prepared and filed by the investor-taxpayers using the fraudulent SCE charitable contribution deductions. These SCE deductions were fraudulent because the underlying transactions lacked economic substance and business purpose other than providing tax deductions and because, in many instances, the charitable contribution was made before the investor was a member of the SCE Fund, and the investor did not even subscribe to the SCE Fund or transfer any money until after the relevant tax year had closed.

Inland Capital Investment Fund 2013

48.    Similar to all of the other SCE Funds, the purported "business plan" for the Fort Myers real property to be acquired by ICIF 2013, as outlined in the PPM, claimed to allow investors to choose from one of the three options: (1) the Development Option; (2) the Buy and Hold Option; or (3) the Green Investment Option. The PPM further predicted that "if" the Green Investment Option were chosen, then the conservation easement would be donated to Land Conservancy 1. However, in reality, the "Green Investment Option"—that is to say, the tax shelter option—was a foregone conclusion.

49.    Promoter A, AGEE, and other co-conspirators sold "investment" units in ICIF 2013 to investor-taxpayers. Many of the units Promoter A, AGEE, and other co-conspirators/sub-promoters sold to investor-taxpayers were sold after the close of the tax year.

50.    ICIF 2013 was not fully subscribed at the close of the 2013 tax year, meaning Promoter A and his co-conspirators had not yet sold all of the available units in the SCE Fund. So, in order to facilitate and disguise sales of units in ICIF 2013 after the close of the tax year, Promoter A, Stein Agee, and Attorneys A and B agreed to form special purpose vehicles and allocate the unsold units to those entities. Promoter A, together with Attorney A and Attorney B, caused two special purpose vehicles to be formed: (1) Green Fields LLC ("Green Fields") and (2) Petite Pines, LLC ("Petite Pines"). Promoter A allocated unsold units in ICIF 2013 to each of these entities as of the end of 2013. Then, during 2014, Promoter A, AGEE, and other co-conspirators/sub-promoters continued to sell units in ICIF 2013 to investor-taxpayers both directly and indirectly through Green Fields or Petite Pines even though the tax year was already closed.

51.    Green Fields was organized on or about December 27, 2013, by Attorney A. Ultimately, Green Fields had 22 investor-taxpayers, at least two of whom were AGEE's clients. Green Fields, through ICIF 2013, received a pro-rata portion of the conservation easement donation deduction in the amount of $22,826,790. The deduction was then passed through to its investor-taxpayers on a pro-rata basis. Every single investor in Green Fields, which was formed to hold units of ICIF 2013 that were

12

not sold at the close of 2013, invested after the charitable contribution had already been made and after the relevant tax year had already closed.

52.    Furthermore, Promoter A arranged for some of the unsold units held by Green Fields to be given, for free, to certain individuals whose "investments" in a prior SCE Fund organized by Promoter A had been reduced following a previous IRS audit, thereby diluting the shares of the investors who actually paid to participate in ICIF 2013, and without disclosing the arrangement to those paying investors.

53.    The $66,214,000 "charitable contribution" by Ft. Myers, like the corresponding tax deduction, was passed through ICIF 2013 to each client-taxpayer partner of ICIF 2013 as well as to Individuals A and B, based on their respective ownership percentage.

54.    Each client-taxpayer received a Schedule K-1 from ICIF 2013 reporting a charitable contribution deduction of more than four times his or her initial capital contribution, just as Promoter A had promised. Each client-taxpayer reported the flow-through charitable contribution on his or her respective individual tax return and applied the corresponding deduction to reduce his or her tax liability.

*Specific SCE Funds: Southern Appalachian Investment Fund 2014*

55.    Promoter A, AGEE, and his co-conspirators marketed and sold interests in Southern Appalachian Investment Fund 2014 ("SAIF 2014") to numerous investors as tax shelters. Each of the investor-taxpayers in SAIF 2014 received a false Schedule K-1 improperly reporting a charitable contribution more than four times his or her capital contribution.

56.    Promoter A and other co-conspirators sold units of "investment" in SAIF 2014 to investor-taxpayers after the donation was made and after the close of the relevant tax year. The co-conspirators backdated documents and payments related to these late "investments" to make it appear as if the "investments" were timely made.

*Specific SCE Funds: Inland Capital Appalachian Fund 2015*

57.    Promoter A, AGEE, and other sub-promoters sold units of interest in Inland Capital Appalachian Fund 2015 ("ICAF 2015") to investor-taxpayers. The total $24,019,800 "charitable contribution" and corresponding deduction was passed through ICAF 2015 to each client-taxpayer in the Fund.

13

58.     Thus, each of the investors in ICAF 2015 received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution. And, each investor filed a false tax return that claimed the bogus charitable contribution deduction.

59.     Promoter A, AGEE, and other co-conspirators improperly sold units of "investment" in ICAF 2015 after the close of the tax year. These late sales were fraudulently backdated to make it appear as if the "investments" were timely made and the false charitable deductions claimed on the tax returns by these late investors were legitimate.

### *Specific SCE Funds: Coastal Properties Holdings, LLC*

60.     Promoter A, AGEE, and others sold "investment" units in Coastal Properties Holdings, LLC ("CPH") to hundreds of investor-taxpayers. The $179,760,000 "charitable contribution" and corresponding deduction were passed through CPH to each client-taxpayer partner of the Fund. Thus, each of the investor-taxpayers in CPH received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution and filed false tax returns which claimed these false charitable contribution deductions.

61.     Promoter A, AGEE, and other co-conspirators improperly sold units of interest in CPH after the close of the tax year. Investor-taxpayers purchased units after the close of the tax year and received false Schedules K-1, and the charitable deductions claimed by these late investors on their filed tax returns were fraudulent.

### *Specific SCE Funds: Coastal Community Partners*

62.     Promoter A, AGEE, and other co-conspirators sold units of interest in Coastal Community Partners, LLC ("CCP") to investors. The $96,810,000 "charitable contribution" and corresponding deduction was passed through CCP to each client-taxpayer partner of the CCP. Thus, each of the investors in CCP received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution and filed false tax returns which claimed these false charitable contribution deductions.

14

63. Promoter A, AGEE, and other co-conspirators improperly promoted and sold units of interest in CCP after the close of the 2017 tax year. For some of these late investors, Promoter A, AGEE, and other co-conspirators instructed investor-taxpayers who did not timely invest to sign promissory notes promising to pay for their "investments" at a later date. Attorneys A and B drafted the promissory notes. AGEE, and other co-conspirators instructed investor-taxpayers to fraudulently backdate these promissory notes to make it appear as if the notes had been entered into prior to the close of the tax year when, in fact, they were executed well after the close of the tax year.

64. The promissory note option was specifically—although not exclusively— offered to large investors who anticipated substantial income for the 2018 tax year. Promoter A, AGEE, and other co-conspirators pitched the CCP fund to certain clients by advising them that the tax deduction generated by the CCP fund could be carried forward from the 2017 tax year to the 2018 tax year. The clients were also told that this carry-forward would be useful, in particular, if the tax law changed to be more restrictive with respect to conservation easements.

*Specific SCE Funds: Southeast Property Acquisitions LLC*

65. Promoter A, AGEE, and other co-conspirators sold units of interest in Southern Property Acquisitions LLC, ("SPA") to hundreds of investors. A $178,440,000 "charitable contribution" and corresponding deduction was passed through SPA to each client-taxpayer in the SPA Fund. Thus, each of the investors in SPA received a Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution and filed false tax returns which claimed the false charitable deduction.

66. Promoter A, AGEE, and other co-conspirators improperly promoted and sold units of interest in SPA after the close of the 2018 tax year. AGEE told some of his clients that the documents needed to backdated in order to make it appear as if they had been executed in the 2018 tax year. Investor-taxpayers purchased units after the close of the tax year, and the charitable deductions claimed on the tax returns filed by those investors were fraudulent.

15

### Preparation of False and Fraudulent Income Tax Returns

67.     AGEE willfully prepared false and fraudulent individual income tax returns for his clients that reflected the fraudulent tax deductions generated by the syndicated conservation easement transactions. For many of these clients' tax returns, AGEE also knew that the clients had invested in the SCE Funds after the close of the tax year, and that the clients therefore would not be entitled to take a charitable deduction related to the SCE donations that were reported on their tax returns, even if the "investment" was otherwise legitimate—which it was not.

### Tax Loss Caused by the Fraudulent Tax Shelters

68.     Because the SCE Fund transactions were planned, structured, and executed for the sole purpose of generating huge tax deductions for investors (and therefore lacked any other economic substance and business purpose), Promoter A's tax shelters resulted in a massive evasion of taxes, all facilitated by Promoter A, AGEE, Stein Agee, and other unnamed coconspirators on behalf of their clients and investors.

### Financial Benefits to AGEE

69.     All of the participants who promoted this scheme earned money for their efforts. All of Promoter A's SCE Funds paid out money, sourced from the investors, to Promoter A and his enterprise, usually in the form of a "management fee" paid to Company 1 or whatever other registered entity Promoter A and his co-conspirators assigned to act as the manager. Promoter A used these fees, in part, to pay commissions to the SCE Funds' various sub-promoters, including AGEE.

70.     AGEE began receiving commissions from Promoter A for promoting the SCE Funds to tax clients in 2013. Promoter A paid the commissions to LLC-1, which was owned by AGEE and two other partners from Accounting Firm 1. Promoter A paid the commissions to LLC-1 to keep the revenue outside of Accounting Firm 1.

71.     AGEE did not disclose his receipt of commissions from Promoter A for the sale of the SCE Funds to his clients. Instead, AGEE described the commissions to his clients as consulting fees. In total, for the years 2013 through 2019, AGEE received more than $1.7 million in commissions.

16

72. From time to time, Promoter A also gave to AGEE, through LLC-1, units in the SCE Funds as additional compensation. These units in the SCE Funds were used to offset income earned by LLC-1, and the deduction flowed-through to AGEE's individual income tax return, as well as to the other two members of LLC-1. AGEE did not report the units as income on LLC-1's partnership returns, despite the fact that neither AGEE nor LLC-1 paid for the units.

## Count of Conviction

### *Count One: Conspiracy to Defraud the United States*

73. Through this plea, the Defendant admits that, beginning as early as 2013 and continuing through at least December 2019, both dates being approximate and inclusive, in Buncombe County, within the Western District of North Carolina, and elsewhere, the Defendant, COREY AGEE did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the United States Attorney to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

### Object of the Conspiracy

74. It was a part and object of the conspiracy that, from at least 2013 until in or about December 2019, the Defendant, COREY AGEE, and others known and unknown to the United States Attorney, to impede, impair, defeat, and obstruct the lawful governmental functions of the IRS in the ascertainment, assessment, and collection of income taxes through the design, marketing, and implementation of fraudulent tax shelter transactions in the form of syndicated conservation easement donations.

### Manner and Means

75. AGEE and his co-conspirators, and others known and unknown to the United States Attorney, carried out the object of the conspiracy according to the following manner and means, among others:

17

a. They marketed, and implemented the fraudulent syndicated conservation easement transactions, and created false and fraudulent factual scenarios to support those transactions;

b. They marketed, and implemented the SCE transactions in ways that impeded and obstructed the ability of the IRS to detect the fraudulent nature of the transactions;

c. They provided the tax savings ratio to prospective investors before Appraiser 1 or Appraiser 2 had appraised the value of the easement.

d. They marketed, and implemented the SCE transactions to disguise the fact that the SCE transactions were tax-motivated and lacked any non-tax business purpose;

e. They prepared and assisted in preparing, and caused to be prepared, false and fraudulent documents to deceive the IRS, including but not limited to, backdated subscription agreements, checks, and promissory notes;

f. They prepared and caused to be prepared tax returns for the SCE clients that were false and fraudulent because, among other things, they claimed fraudulent tax deductions related to the conservation easement deduction, and thereby substantially understated the tax due and owing by the SCE clients;

g. They prepared and caused to be prepared fraudulent documents to be provided to the IRS in the event of an IRS audit; and

h. They paid, caused to be paid, or received referral fees and commissions, which frequently were not disclosed to the clients, as a means of rewarding those who marketed the syndicated conservation easement scheme and to provide incentives to others to do so.

## Overt Acts

76. To accomplish the objects of the conspiracy, AGEE and his co-conspirators, and others known and unknown to the United States Attorney, committed and caused to be committed the following overt acts, among others, in the Western District of North Carolina and elsewhere:

18

a.  Beginning sometime in 2013, Promoter A, AGEE, and others began marketing ICIF 2013 to investors as a "tax-savings" vehicle.

b.  In 2014, AGEE and other co-conspirators sold units of "investment" in ICIF 2013 through Green Fields to make it appear as if the "investments" were made in 2013.

c.  In 2014, Promoter A, AGEE, and other co-conspirators also arranged for the free, late participation in ICIF 2013, through Green Fields, of certain investors whose "investments" in a prior SCE Fund organized by Promoter A had been reduced following a previous IRS audit, thereby diluting the shares of the investors who actually paid to participate in ICIF 2013, and without disclosing the arrangement to those paying investors.

d.  In or around September 2014, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from ICIF 2013, via Green Fields. AGEE knew, at the time he prepared the returns, that the clients had neither timely subscribed to ICIF 2013 nor paid for the "investment" units in ICIF 2013 that resulted in them claiming the deduction on their tax returns.

e.  On or around December 9, 2014, AGEE emailed client M.R. about how many units of "Conservation Easement" he would need to purchase based on AGEE's tax projection for 2014. The subject line of the email was "Conservation Easement Purchase." AGEE recommended purchasing 1.75 units ($43,750), explaining that M.R. could use 80% of the deduction with the remaining 20% to be used "in case there is any adjustment to the conservation easement." AGEE further advised that the 20% could also be carried forward to 2015. This email was sent prior to the donation of the conservation easement.

f.  In 2015, Promoter A and other co-conspirators sold units of interest in SAIF 2014 to late investors and backdated and caused to be backdated the payments and documents related to the investor-taxpayers late "investments."

19

g. In an email dated May 29, 2015, sent by AGEE to his client W.M., AGEE informed W.M. that he had "calculated the amount of conservation easement you can use for the 2015 year." He further informed W.M. that Promoter A's assistant would email him the paperwork for the conservation easement and indicated he would need to purchase "$100,000 (4 Units) of conservation easement" for the 2015 year. This email was sent nearly six months before any purported "vote" to donate a conservation easement and well before the final appraisal for any such conservation easement had been completed.

h. In 2015, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from SAIF 2014. AGEE knew, at the time he prepared the returns that the clients had neither timely subscribed to SAIF 2014 nor paid for the "investment" units in SAIF 2014 that resulted in them claiming the deduction on their tax returns.

i. In 2016, Promoter A, AGEE, and other co-conspirators sold units of "investment" in ICAF 2015 and backdated, and caused to be backdated, related "investment" documents to make it appear that the "investments" had been made in 2015.

j. In 2016, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from ICAF 2015. AGEE knew, at the time he prepared the returns that the clients had neither timely subscribed to ICAF 2015 nor paid for the "investment" units in ICAF 2015 that resulted in them claiming the deduction on their tax returns.

k. In 2017, Promoter A, AGEE, and other co-conspirators sold units of "investment" in CPH and backdated, and caused to be backdated, related "investment" documents to make it appear that the "investments" had been made in 2016.

l. In 2017, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from CPH. AGEE knew, at the time he prepared the returns that the clients had neither timely subscribed to CPH nor paid for the

"investment" units in CPH that resulted in them claiming the deduction on their tax returns.

m.     On December 28, 2017, at AGEE's request, Promoter A's assistant emailed AGEE's client K.C. attaching K.C.'s subscription agreement for CCP that was dated on or about December 28, 2017, along with a pledge agreement and promissory note. Client K.C. wired the funds in October 2018. Nonetheless, knowing client K.C. had not timely invested, in or around October 12, 2018, AGEE prepared K.C.'s 2017 federal income tax return and included the conservation easement charitable contribution donation flowing through from CCP.

n.     In 2018, Promoter A, AGEE, and others sold units of "investment" in CCP and backdated, and caused to be backdated, related "investment" documents, including promissory notes, to make it appear that the "investments" had been made in 2017.

o.     In 2018, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from CCP. AGEE knew, at the time he prepared the returns that the clients had neither timely subscribed to CCP nor paid for the "investment" units in CCP that resulted in them claiming the deduction on their tax returns.

p.     In the fall of 2018, Promoter A began marketing "investments" in Southeast Property Acquisitions, LLC.

q.     In 2019, Promoter A, AGEE, and other co-conspirators sold units of "investment" in SPA, LLC and backdated the related "investment" records to make it appear as if the "investments" were made in 2018.

r.     In 2019, AGEE prepared false and fraudulent returns for clients that reported a non-cash charitable contribution that flowed through to their returns from SPA. AGEE knew, at the time he prepared the returns that the clients had neither timely subscribed to SPA nor paid for the "investment" units in SPA that resulted in them claiming the deduction on their tax returns.

21

All in violation of Title 18, United States Code, Section 371.

## Relevant Conduct

77.   **Tax Loss:** While the overall tax loss attributable to the conspiracy is more than $250 million, the parties agree that the tax loss attributable to the Defendant, for purposes of U.S.S.G. § 2T1.4(a)(1), and from which the Defendant is not shielded by U.S.S.G. § 1B1.8, is more than $9.5 million, but not more than $25 million. More specifically, the parties agree that the tax loss is approximately **$18,803,183,** consisting of estimated tax losses associated with the SCE Funds ICIF 2013 and CCP (individual federal income tax returns prepared by Corey Agee claiming deductions flowing through from CCP), described above, each of which the Defendant admits were tax shelters and a part of the conspiracy's fraudulent scheme. This estimate was calculated as follows:

|  | Deduction Value | Estimated Tax Rate | Estimated Tax Loss |
|---|---|---|---|
| ICIF 2013/ Fort Myers | $66,214,000.00 | 0.28 | $16,949,984.00 |
| CCP/Figure 8 (Georgia) LLC – partial evaluation of loss caused by false returns prepared by Corey Agee | $6,618,567.86 | 0.28 | $1,853,199 .00 |
|  |  | **TOTAL:** | **$18,803,183.00** |

78.   **Sophisticated Means:** The parties agree that the offense, as described above, involved "sophisticated means," given the significant scope of the criminal conduct, the legal and technical complexity of the "investment" vehicles created by Promoter A and his co-conspirators, and the extent to which the co-conspirators created fictitious and false documents and records to conceal their wrongdoing.

22

79. **Return Preparer:** The parties agree that the Defendant was in the business of preparing or assisting in the preparation of tax returns during the commission of the offense.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

DANIEL V. BRADLEY, ASSISTANT UNITED STATES ATTORNEY
CARYN FINLEY, ASSISTANT UNITED STATES ATTORNEYS
BRITTNEY CAMPELL, TRIAL ATTORNEY, TAX DIVISION
GRACE ALBINSON, TRIAL ATTORNEY, TAX DIVISION

### Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the Plea Agreement in this case, and I have discussed them with the Defendant. Based on those discussions, I am satisfied that the Defendant understands the Factual Basis, the Bill of Information, and the Plea Agreement. I hereby certify that the defendant does not dispute this Factual Basis.

Douglas Kingsbery, Attorney for Defendant

DATED: 12/11/20

23